# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 2:12-cr-00074 |
| | ) | |
| MARK BELISLE | ) | |

## ORDER ON DEFENDANT'S MOTION TO SUPPRESS

The Defendant, Mark Belisle, has been charged with one count of possessing a firearm in furtherance of a drug trafficking crime and one count of possessing marijuana with the intent to distribute, in violation of 18 U.S.C. § 924(c) and 21 U.S.C. § 841(a)(1). Before the Court is the Defendant's Omnibus Motion to Suppress Evidence (ECF No. 27). The Defendant moves to suppress evidence found as a result of a search warrant authorizing the installation and use of an electronic tracking device on the Defendant's car and evidence found as a result of a search warrant authorizing the search of the Defendant's home. The Court has considered the testimony, evidence, and counsels' arguments presented at the hearing on February 6, 2013. The Court **DENIES** the Defendant's motion.

## FACTS

### I. The Warrant for a GPS Tracker

On September 7, 2011, Maine Drug Enforcement Agency (MDEA) Special Agent (SA) Tony Milligan obtained a warrant from Maine District Court authorizing the nighttime installation and use of an electronic tracking device for

1

45 days on the Defendant's 1999 GMC Suburban. SA Milligan's affidavit contained the following facts. Def.'s Ex. 1 (ECF No. 27-1).

In January of 2010, a Lisbon police detective and MDEA SA Chad Carleton interviewed a confidential informant (CI)[1] who provided them with information about Terry Johnson, who the CI described as a large-scale marijuana dealer living in Litchfield, Maine who regularly receives about 50 pounds of marijuana, which he redistributes in smaller quantities. The CI described Johnson's property and residence, and SA Carleton located Johnson's Litchfield residence based on the CI's description.

In June of 2010, the CI reported to SA Carleton that he had been with Johnson at Johnson's house two days before, and Johnson had told the CI that he pays $33,000 for a bale of marijuana. The CI saw large trash bags at Johnson's house that contained marijuana remnants and smelled strongly of marijuana.

In August of 2010, the CI told SA Carleton that he had been at Johnson's house that day, and Johnson had said that he was expecting a marijuana resupply soon. The CI also told SA Carleton that he had seen a man named Bill pick up a

---

[1] The affidavit states that SA Carleton "has determined that CI is a credible and reliable source of information." Def.'s Ex. 1 ¶ 6. In 2010, the CI had provided information about a Portland residence where marijuana was being cultivated and stored. The CI's information was corroborated by the MDEA, a search warrant was executed at the house, and marijuana was seized from the residence, culminating in a successful prosecution. At the time of this interview, the CI was not facing any criminal charges, and no promises of gain or payment were made to the CI then or subsequently. The Government was unable to explain at oral argument why the individual was dubbed a "confidential informant" rather than a "concerned citizen." *See United States v. Croto,* 570 F.3d 11, 14 (1st Cir. 2009) (individuals willingly providing information and receiving nothing in return "were concerned citizens reporting potential criminal activity, whose stories may be more easily accepted than those of confidential informants whose motivations make their stories more suspect").

duffel bag or two of marijuana from Johnson. The CI told SA Carleton that Bill associates with a man named Mark from Lewiston who drives a blue Suburban.

About a year later, in August of 2011, the CI and SA Carleton spoke on the phone several times. The CI told SA Carleton that Mark, who drove an older blue/green Suburban, was assisting Johnson with a large-scale outdoor marijuana growing operation. He said that the men travel in Mark's Suburban to Johnson's marijuana grow sites to tend the plants. The CI described Mark's residence and its location, and a detective located the Defendant's house based on the CI's description. It had a blue Suburban parked in the driveway that the detective confirmed was registered to the Defendant.

On the morning of August 25, 2011, the CI told SA Carleton that Johnson and the Defendant had left that morning in the Defendant's Suburban to cultivate their marijuana plants because of a predicted hurricane. A detective corroborated that the Defendant's Suburban was not parked at his residence.

The CI also told SA Carleton that Johnson had a small, white towable camper down a hill behind his house where Johnson and the Defendant processed, packaged, and stored their harvested marijuana before Johnson sold it. The CI told SA Carleton that Johnson uses a dehumidifier in the camper to dry out the marijuana and packages it in five gallon buckets. The CI also said that Johnson had recently bragged about making $100,000 in sales from the marijuana he cultivated that year, and said that he shipped the bulk of his marijuana to New York. SA Carleton looked at some aerial photos of Johnson's property taken the previous fall

3

and observed a small white camper sitting behind Johnson's house, which did not appear to have been moved in some time.

Paragraph 12 of Milligan's affidavit states that in the afternoon on August 25, 2011, SA Carleton and other agents conducted surveillance from a wooded area on Johnson's property where SA Carleton could observe the back of Johnson's house and the camper. SA Carleton saw a blue Suburban arrive and park behind a single-wide mobile office sitting next to the house and two middle-aged males get out of the Suburban. One male walked into Johnson's house. The other opened the Suburban's rear door, took out a black trash bag that was approximately one-third full, carried it to the mobile office, and set the bag inside the office before going inside Johnson's house. A short time later, the same man came out of the house and departed in the Suburban. Another agent confirmed that the Suburban was registered to the Defendant.

## II. The Search Warrant for Defendant's Residence

On October 18, 2011, SA Carleton sought and obtained a warrant from Maine District Court to search the Defendant's residence. Def.'s Ex. 3 (ECF No. 27-3). SA Carleton's affidavit for his warrant application relied on details about Johnson and the Defendant's marijuana growing operation obtained through the electronic tracking device on the Defendant's Suburban and independent police investigation, including two additional occasions during which SA Carleton conducted surveillance from the woods on Johnson's property. In the search of the Defendant's home,

4

officers found distributable quantities of marijuana and a semi-automatic assault weapon.

**III.   The Hearing on the Motion to Suppress**

SA Milligan, SA Carleton and the Defendant testified at the hearing on the motion to suppress.

**A. SA Carleton's Testimony about Johnson's Property**

The Johnson property constitutes many acres,[2] which are roughly bounded by Route 197 to the south and a stream that defines the east and northern side of the property. The property can generally be described as a ranch house facing Route 197, which has a small mown lawn area and a few outbuildings. The area of the residence and outbuildings is surrounded by pasture. The pasture is surrounded by woods on the northern and eastern sides of the property and the woods are abutted by two boggy areas and the stream that defines the border of the property. Johnson owns cows which graze on the pasture and traverse the woods to drink from the bogs.

The house is accessed from Route 197 by a driveway which is exposed to the road. Next to the house is a mobile office. Behind the house is a chain link fence that encloses an area which is about the width of the house and extends back from the house approximately forty feet. A small white camper sits in the pasture area about fifteen yards from the back of the house.

---

[2]   Although SA Carleton did not have precise figures he estimated that the Johnson property was about 70 acres. The Defendant testified that the property was about 80 acres.

5

On August 25, 2011, SA Carleton entered the southeast corner of Johnson's property where Route 197, the woods, and the bog converge. He hopped an electric fence[3] and entered the woods. From there, SA Carleton walked in a northwesterly direction through the woods roughly parallel to the bog's edge and the river. When SA Carleton thought he was about even with the back of Johnson's house, he turned west and walked through the woods up a slight grade toward the house. He stopped approximately 100 feet from the tree line where, through the trees, he could see the white camper and the house beyond it. SA Carleton estimated that he was approximately 130 yards away from the house and approximately 115 yards away from the camper where he stopped. It was from this vantage point that SA Carleton observed the activity that comprises paragraph 12 of Milligan's affidavit.

SA Carleton testified that there were no signs advising people to keep out and the property was not posted against hunting. SA Carleton stated that he observed no paths or signs of human activity within the woods with the exception of an abandoned shed and some old feed buckets.

**B. The Defendant's Testimony about Johnson's Property**

The Defendant testified that the electric fence runs around the entire perimeter of Johnson's property and is active.[4] The Defendant testified that the fence is designed to keep livestock in and people out. The Defendant described

---

[3] SA Carleton described the fence as old posts with wires running from post to post. SA Carleton did not touch the wires and could not testify as to whether the fence was electrified. He testified that the fence was designed to contain livestock. Defendant's Exhibit 1 shows a portion of the fence.

[4] Contrary to SA Carleton's testimony, the Defendant testified that the electric fence runs on the outside of the two bog areas and thus allows the cows to have access to water from the bogs.

several paths within the woods that the livestock follow to reach the watering areas. The Defendant stated that Johnson's children at one time used the shed as their play house, but he did not say how recently that activity took place.[5] The Defendant also described a few paths that led to additional clearings in the woods, which are visible on the aerial photograph provided as Government Exhibit 4. The Defendant did not state who used these paths or why or how frequently they are used.

## DISCUSSION

The Defendant's arguments begin with the premise that the information contained in paragraph 12 of Milligan's affidavit must be excised from the affidavit because it was obtained in violation of the Fourth Amendment.[6] Specifically, the Defendant asserts that because SA Carleton was within a constitutionally protected area — the curtilage of the camper where the marijuana was processed — his observations, which form the basis of paragraph 12, must be stricken. Once paragraph 12 is excised from the affidavit, the defense argues, the warrant which allowed the police to place a GPS tracker on the Defendant's vehicle fails for lack of probable cause. The Defendant further argues that the tainted information gleaned from the GPS tracker and additional unconstitutional incursions by SA Carleton

---

[5] The Defendant testified that he had been helping Johnson on the farm since the mid to late 1990's when Johnson's children got old enough and decided that they did not want to help around the farm anymore. This would suggest that the play house, which was described by SA Carleton as a pile of rubble, has not been used in recent years.

[6] The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

7

onto the Johnson property must be struck from Carleton's affidavit. Without the stricken material, the Defendant concludes, Carleton's affidavit did not contain probable cause to support a search of the Defendant's residence.

The Government counters that, as a threshold matter, the Defendant has failed to establish that he has standing to challenge the entry onto Johnson's property.[7] But even if the Court finds standing, the Government contends that SA Carleton was never within the curtilage of either Johnson's house or the camper behind it. Finally, the Government contends that Milligan's affidavit contains probable cause even if paragraph 12 is excised.

I. **The Curtilage Question**

The Supreme Court has held that in addition to a person's house, the Fourth Amendment also protects the "curtilage" of a house, the area surrounding the house that is so "intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *United States v. Dunn*, 480 U.S. 294, 301 (1987). The Fourth Amendment does not protect open fields, the property outside the curtilage of a home. *Oliver v. United States*, 466 U.S. 170, 178 (1984). The Court considers four factors in determining whether the area around a house should be considered the curtilage:

---

[7] Defendant asserts a privacy interest in the camper and the camper's curtilage, which he claims extends to where the agents stood, because the camper was "used by Johnson and Belisle to harvest and process marijuana for sale." Def.'s Reply to Gov't's Obj. to Def.'s Omnibus Mot. to Suppress 5 (ECF No. 40). The Government contends that the Defendant lacks standing to challenge the search of a camper owned by Johnson on Johnson's land. The Court notes that both Milligan and Carleton's affidavits contain evidence that the Defendant used the camper with Johnson as a processing facility for the marijuana that they were harvesting. Because the Court concludes, *infra*, that the search was valid, it will assume without deciding that the Defendant had a reasonable expectation of privacy in the camper.

8

the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

*Dunn,* 480 U.S. at 301.[8]

The Defendant cannot and does not assert that he had a reasonable expectation of privacy in Johnson's house and curtilage. His argument is that he had a reasonable expectation of privacy in the camper and its curtilage, which he claims extends to the electric fence surrounding the Johnson property. His argument, essentially, is that the camper was his place of business.

SA Carleton credibly testified that he was positioned 100 feet into the woods approximately 115 yards away from the camper. Assuming, without deciding, that the Defendant did have a reasonable expectation of privacy in the camper as his place of business, and presuming that the camper actually had its own curtilage, the evidence does not support the Defendant's claim that the camper's curtilage

---

[8] In *Dunn,* law enforcement officials made a warrantless entry onto the defendant's ranch, which comprised approximately 198 acres completely encircled by a perimeter fence and containing several interior fences constructed mainly of posts and multiple strands of barbed wire. The agents crossed over the perimeter fence and one interior fence and proceeded to a barn that was approximately sixty yards away from a house that was encircled by another fence. To reach the barn, the officers crossed yet another interior fence as well as a wooden fence that enclosed the front portion of the barn. The officers walked under the barn's overhang to the barn's locked wooden half-gates and looked inside the barn. From that position, they observed a phenylacetone laboratory. *Id.* at 297-98.

The majority in *Dunn* held that the barn was outside the curtilage of the home where: 1) the barn was not sufficiently close to the house to be treated as an adjunct of the house; 2) the clearly marked curtilage was the house and the fence immediately around the house and did not extend to the barn; 3) the officers had information that the barn was not being used for intimate activities of the home; and 4) the defendant had done "little to protect the barn area from observation by those standing in the open fields." *Id.* at 301-303.

In *Dunn*, the respondent made an alternate argument that he possessed an expectation of privacy, independent of his home and its curtilage, in the barn and its contents because the barn was an essential part of his business. The Supreme Court rejected the argument, concluding that the unoccupied barn was part of the open fields. *Id.* at 304.

extended past the open pasture areas and into the woods.[9] Defendant's argument that the camper's curtilage extended to the perimeter fence on Johnson's property would mean that the little camper enjoyed a curtilage of approximately 70-80 acres. That theory stretches the curtilage concept beyond recognition.

The Defendant makes much of his argument that the livestock fences were to keep animals in and people out. But the same type of fence was at issue in *Dunn*, where the Court stated: "Nothing in the record suggests that the various interior fences on respondent's property had any function other than that of the typical ranch fence; the fences were designed and constructed to corral livestock, not to prevent persons from observing what lay inside the enclosed areas." *Dunn,* 480 U.S. at 303. Notwithstanding the Defendant's self-serving testimony that the fences were designed to keep people out, neither a barbed wire nor an electric fence provides protection from prying eyes or from anyone dexterous enough to duck through the openings between the wires.

The Defendant's Fourth Amendment rights were not violated by the surveillance from the woods behind Johnson's pastures, and SA Carleton's observations during that surveillance were properly included in SA Milligan's affidavit.

---

[9] In *United States v. Diehl*, 276 F.3d 32 (1st Cir. 2002), the First Circuit held that an entire half-acre clearing on a remote property in Maine constituted the curtilage to a crude camp and its adjacent marijuana processing building. The Court noted, however, that the entire clearing was used by the camp occupants for intimate activities of living, including nude sunbathing, conjugal activities, and urination. *Id.* at 37, 40-41. There was no testimony in this case that the pasture or wooded areas were used for any activities of living or any activities association with business related to the camper.

10

## II. Probable Cause in the Milligan Affidavit

The government's installation of an electronic tracking device on a person's vehicle and use of that device to track that person's movements is a search for purposes of the Fourth Amendment. *United States v. Jones*, 132 S. Ct. 945, 949 (2012).

When issuing a warrant,

> [t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of the reviewing court is simply to ensure that the magistrate had a "substantial basis for . . . conclud[ing]" that probable cause existed.

*Illinois v. Gates*, 462 U.S. 213, 238-39 (1983) (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)). "A warrant application must demonstrate probable cause to believe that (1) a crime has been committed – the 'commission' element, and (2) enumerated evidence of the offense will be found at the place to be searched – the so-called 'nexus' element." *United States v. Feliz*, 182 F.3d 82, 86 (1st Cir. 1999).

SA Milligan's affidavit establishes that the CI was known to SA Carleton and had provided information on another marijuana growing operation a year earlier that had led to a successful search, seizure of marijuana, and conviction. The affidavit states that SA Carleton believes the CI to be credible and reliable. The affidavit also establishes that the CI was not facing any criminal charges and was not paid or promised payment or gain for his information. The CI offered first-hand knowledge about Johnson's activities. *See United States v. Greenberg,* 410 F.3d 63,

67 (1st Cir. 2005) (frequent face-to-face contact between agent and informant, information that informant has been reliable in the past, and first-hand knowledge possessed by an informant all support the informant's credibility).

The officers corroborated details of the CI's information. Officers located Johnson's residence and the Defendant's residence and vehicle based on the CI's descriptions. SA Carleton corroborated the existence of the camper behind Johnson's property from a photograph taken the year before that suggested that the camper was not frequently moved. The officers corroborated that the Defendant's Suburban was not parked at his house the morning the CI said that the Defendant and Johnson were visiting their grow sites in the Defendant's Suburban. SA Carleton further corroborated the CI when he went to Johnson's property and observed two men arriving at Johnson's house in the Defendant's Suburban. One man brought a garbage bag about one-third full from the Suburban to a mobile office parked on Johnson's property. Both men entered the house and one man left shortly thereafter in the Defendant's Suburban. Finally, the affidavit establishes a nexus between the suspected marijuana growing operation and the Defendant's Suburban, which the officers suspected was what the Defendant and Johnson used to visit their grow sites and transport marijuana from the grow sites to Johnson's home.

The Court concludes that the affidavit contained sufficient information to allow the issuing judge to find the CI credible and to have a substantial basis to conclude that there was a fair probability that installing an electronic tracking

device on the Defendant's Suburban would uncover evidence of the Defendant and Johnson's marijuana growing operation.

The Court finds that the affidavit authorizing the installation of the electronic tracking device on the Defendant's car was issued on probable cause, and the Defendant's Fourth Amendment rights were not violated.

### III. Probable Cause in the Carleton Affidavit

Defense counsel conceded at oral argument that Carleton's affidavit, if considered as a whole, contained probable cause to support the search of the Defendant's house. Because the Court has concluded that SA Carleton's presence on Johnson's property did not violate the Fourth Amendment, and the warrant authorizing the electronic tracking device was issued on probable cause, Carleton's affidavit should be considered in its entirety, and the issuing judge had a substantial basis for concluding that probable cause existed to search the Defendant's home.

### CONCLUSION

The Court concludes that there was no violation of the Defendant's constitutional rights. The Defendant's motion to suppress is **DENIED**.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 11th day of February, 2013.